UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

Plaintiff,

<u>DECISION AND ORDER</u>

05-CR-6068L

v.

GLENN HARPER,

Defendant.
_____

Defendant, Glen Harper, is charged in a six-count indictment with various firearms-related offenses.  This case is currently scheduled to begin trial on January 26, 2009.

The government has filed three motions in limine seeking to admit certain evidence, and to preclude or limit certain other evidence.  This Decision and Order constitutes my rulings on those three motions.

**DISCUSSION**

**I. CAD Printout from 911 Call**

In its first motion in limine (Dkt. #140), the government seeks a ruling permitting the government to introduce, pursuant to Rule 803(6) of the Federal Rules of Evidence, a certified CAD

printout of the City of Rochester (New York) Emergency Communications Department's 911 Center ("ECD").[1]  This printout was generated in response to a 911 telephone call by defendant's mother, Gertrude Harper ("Mrs. Harper"), on September 20, 2004.   In that call, Mrs. Harper allegedly reported that her son Glen had just called her on the telephone and told her that he had a gun and that he was coming over to shoot her and his father, Mrs. Harper's husband Joseph Harper.   Defendant had allegedly threatened Joseph Harper with a shotgun the day before.

At one point during the 911 call, Mrs. Harper, who was calling from a location on Central Park in Rochester, also allegedly stated that defendant Glen Harper had just driven by her, and that she had seen him drive to, and enter, the Harper family residence at 151 Third Street, which was apparently not far from Mrs. Harper's location.[2]

In response to Mrs. Harper's call, officers of the Rochester Police Department were dispatched to Mrs. Harper's location, where they spoke to her for several minutes.   From there the officers went to 151 Third Street, where defendant eventually surrendered to the officers and was arrested.   A subsequent search of the Third Street premises uncovered a sawed-off shotgun inside the house, which defendant's father later identified as the same gun with which defendant had

---

[1]Although the government's motion does not appear to state what "CAD" stands for, it apparently is an acronym for "computer aided dispatch."   *See Burke v. County of Monroe*, 225 F.Supp.2d 306, 309 (W.D.N.Y. 2002).

[2]According to the government, a separate 911 operator's notes indicate that defendant himself later called 911 from 151 Third Street–apparently after the police arrived there–and stated, *inter alia*, that there was no gun in the house (which proved to be untrue).   That call is not directly at issue in the government's in limine motion concerning the CAD printout from Mrs. Harper's call.

threatened him the night before defendant's arrest.  Defendant's alleged possession of that shotgun forms the basis for Counts IV and V of the indictment.

Although an audio recording was made of Mrs. Harper's 911 call, the government states that, in accordance with ECD policy, that recording was destroyed after one year.  As stated, the government seeks to introduce the CAD printout from the call, which sets forth the gist of Mrs. Harper's statements recited above.  *See* Dkt. #140 Ex. A.

Defendant argues that this evidence constitutes inadmissible hearsay.  The government contends that Mrs. Harper's statements to the 911 operator are admissible as an excited utterance or present sense impression, and that the CAD printout is admissible as a business record.  *See* Fed. R. Evid. 803(1), 803(2), 803(6).

"Hearsay statements on a 911 tape can be admitted into evidence as either a 'public record,' Fed. R. Evid. 803(8)(B), or a 'business record,' Fed. R. Evid. 803(6).  However, because citizens who call 911 are not under any 'duty to report,' Fed. R. Evid. 803(8)(B), a recorded statement by a citizen must satisfy a separate hearsay exception."  *Bemas v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) (additional citations omitted); *see also United States v. Sagas*, 266 Fed.Appx. 258, 262 (4th Cir. 2008) (recording of 911 call was admissible under Rule 803(6) because it constituted a record kept in the course of a regularly conducted business activity).

There does not seem to be any dispute here that the CAD printout itself meets the requirements for admission as a business record under Rule 803(6).  The government has submitted a sworn certification by an ECD employee (Dkt. #140-2), which establishes that the printout is a "report, record, or data compilation ... made at or near the time by ... a person with knowledge" of

the 911 call, that it was "kept in the course of a regularly conducted business activity" of the ECD, and that "it was the regular practice of [the ECD] make the ... report, record or data compilation ... ." Fed. R. Evid. 803(6).[3]

There is also nothing in the record to cast any doubt on the government's assertion that the recording itself was destroyed pursuant to routine ECD policies having nothing to do with the contents of the call in question or this prosecution, and thus the admission of the printout does not violate the best-evidence rule. *See United States v. Ross*, 33 F.3d 1507, 1513 (11th Cir. 1994) (stating that "where the original of a recording has been lost or destroyed, the original is not required and other evidence of its content is admissible, unless the proponent lost or destroyed the original in bad faith," and that "the party against whom the secondary evidence is being offered bears the burden of challenging its admissibility") (citing Fed. R. Evid. 1004(1)), *cert. denied*, 515 U.S. 1132 (1995)); *see*, *e.g.*, *United States v. Jimenez*, 256 F.3d 330, 349 (5th Cir. 2001) (because original recording of debriefing interview had been lost or destroyed, transcript was admissible as "other evidence of [its] contents") (citing Fed. R. Evid. 1004(l)); *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (where audiotape of defendant's deposition was not available because it had been erased by its owner prior to trial, use of tape itself was not required, and best-evidence rule was not violated by admission of transcript instead).

---

[3]Alternatively, the printout would be admissible under the "public records" exception to the hearsay rule. *See* Fed. R. Evid. 803(8) (allowing introduction of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report ..., unless the sources of information or other circumstances indicate lack of trustworthiness").

To be admissible, however, Mrs. Harper's *statements* to the 911 operator, which are reflected in that printout, must also fall within some exception to the hearsay rule.  I agree with the government that they fall within the exceptions for excited utterances and present sense impressions. The CAD printout and its contents are therefore admissible.

"As defined by the Federal Rules of Evidence, a present sense impression is a statement 'describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.'  Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory."  *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (citing Fed. R. Evid. 803(1)).

As the Second Circuit went on to explain in *Jones*,

> [t]he hearsay exception for excited utterances is premised on a similar, though distinct, assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases.  An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Rule 803(2), Fed.R.Evid.  ... The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability.  Unlike present sense impressions, an excited utterance need not be contemporaneous with the startling event to be admissible.  Rather the length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), "under the stress of excitement caused by the event or condition."

*Id.* (additional internal quotation marks and citations omitted).  "Thus while the hearsay exception for present sense impressions focuses on *contemporaneity* as the guarantor of reliability, and requires that the hearsay statement 'describe or explain' the contemporaneous event or condition, the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission

of a broader range of hearsay statements– *i.e.* those that 'relate to' the event." *Id.* at 112 n. 3 (citations omitted).

As stated, the caller here, Mrs. Harper, called 911 and reported that her son Glen had just called her and stated that he was coming with a gun to shoot her and her husband.  During the call, she also reported that Glen had just driven by her and that he was at that moment at the family home on Third Street, not far from where Mrs. Harper was calling.

Clearly, then, Mrs. Harper called about "a startling event or condition"–a statement by defendant that he was, at that moment, on his way over to shoot her and her husband, defendant's father–that had occurred no more than minutes earlier.  Her statements about seeing Glen drive by and go to 151 Third Street were made contemporaneously with the event that she described, which she had personally witnessed.

All these statements, then, fall within recognized exceptions to the hearsay rule.  *See United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007) (although one or two minutes may have elapsed between alleged threat by defendant and 911 call, "Rules 803(1) and (2) do not require that the statement occur contemporaneously with the event, ... since 'in many, if not most, instances precise contemporaneity is not possible and hence a slight [time] lapse is allowable'") (quoting Fed. R. Evid. 803(1) Advisory Committee's Note); *United States v. Thomas*, 453 F.3d 838, 843-44 (7th Cir. 2006) (where anonymous caller stated to the 911 operator that "'[t]here's a dude that just got shot ...,' and that 'the guy who shot him is still out there,'" district court did not err in admitting recording of call under Rules 803(1) and 803(2)); *United States v. Abraham*, 386 F.3d 1033, 1037 (11th Cir. 2004) (finding no plain error in admission of recording of 911 call under excited-utterance exception,

where caller reported that defendant had used a gun to threaten defendant's girlfriend's mother and sister), *cert. denied*, 546 U.S. 934 (2005); *United States v. Allen*, 235 F.3d 482, 493 (10th Cir. 2000) (911 tape was admissible as both a present sense impression and an excited utterance, since caller's statements were made at the time that defendant was trying to get into caller's apartment, and "[t]he evidence showed that [caller] was distressed by Mr. Allen's presence at her apartment"); *cf. Brown v. Keane*, 355 F.3d 82, 88-90 (2d Cir. 2004) (anonymous 911 call was not admissible where caller's statements indicated that he had not personally witnessed shooting in question, and that his statements describing shooter were based on surmise rather than on personal knowledge).

Nor does admission of the printout give rise to any Confrontation Clause issues. The Confrontation Clause applies only to testimonial statements. Statements admitted as excited utterances or present sense impressions are nontestimonial and thus do not implicate the Confrontation Clause. *See Davis v. Washington*, 547 U.S. 813, 821 (2006) (statements made in 911 call "to describe current circumstances requiring police assistance" were not testimonial); *United States v. Cadieux*, 500 F.3d 37, 41-42 (1st Cir. 2007) ("the statements recorded during the 911 call are nontestimonial"); *Thomas*, 453 F.3d at 843-44 (anonymous caller's statements to the 911 operator, that "'[t]here's a dude that just got shot ...,' and that 'the guy who shot him is still out there,'" were nontestimonial and did not implicate defendant's right to confrontation).

## II. Defendant's Exculpatory Statements

## A. Statements during Post-Arrest Interview

In its second motion in limine (Dkt. #141), the government seeks to preclude the defense

from eliciting self-exculpatory statements that defendant made to the police and to Mrs. Harper. This motion thus involves two separate sets of statements.

The first set of statements is from an interview of defendant by Investigator Thomas Cassidy at the Public Safety Building in Rochester on April 22, 2005. Earlier that day, police officers had executed a search warrant at 151 Third Street, where they found a number of firearms and firearms-related evidence. Some of the items seized during in that search form the basis for Counts I, II and III of the indictment.

During the interview, defendant and Investigator Cassidy, who conducted the interview, discussed a number of matters. According to Cassidy's written report (which the government does not seek to introduce at trial), defendant asked what he was being charged with, and Cassidy responded that he was not sure yet because checks were still being performed to see if the seized guns were stolen, and because the search had still been going on when Cassidy left the premises.

Harper then stated that he had been in prison several times and was familiar with the law. He added that "he knew he was looking at Criminal Possession of a Weapon 2nd or 3rd and some kind of possession of stolen property" charge. Dkt. #141 at 2.

During this conversation, defendant made several statements that were, on their face, self-exculpatory. For example, when Cassidy asked him if guns were his, Harper responded that they were not. He opined that the guns must have belonged to his brother, since they did not belong to Harper himself or to his parents. *Id.* at 3.

Cassidy then asked Harper why he thought he would be charged with possession of stolen property. Harper replied that "no one [in the house] had a hunting license and he knew they looked like hunting guns so they must be stolen." *Id.* He added that "he didn't know [who] would have

- 8 -

stolen the guns," and that he was afraid that "the DA's office would be out to get him" because "he had recently beaten a gun charge ... ."  *Id.*

The government seeks to introduce, through Cassidy's testimony, Harper's statements about having been to prison and being familiar with the law, and about his belief that he was "looking at" certain criminal charges.  The government does not intend to introduce Harper's other statements indicating that the guns did not belong to him, that he did not know where they came from, etc., and the government also seeks to preclude defense counsel from eliciting those statements on cross-examination of Cassidy.

Defendant opposes the government's motion to preclude, arguing that the "rule of completeness" requires that, if some of his statements to Cassidy are admitted into evidence, then the self-exculpatory statements should be as well.  Defendant contends that it would be improper and misleading to allow the jury to hear only some of his statements from the interview.

Under "the rule of completeness embodied by Federal Rule of Evidence 106 ..., even though a statement may be hearsay, an 'omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'"  *United States v. Johnson*, 507 F.3d 793, 793 (2d Cir. 2007) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987), *cert. denied*, 484 U.S. 844 (1987)) (footnote omitted).[4]

---

[4]"While Rule 106 applies only to writings, [the Second Circuit] ha[s] previously explained that the rule of completeness is 'substantially applicable to oral testimony, as well' by virtue of Fed. R. Evid.  611(a), which obligates the court to 'make the interrogation and presentation effective for the ascertainment of the truth.'"  *United States v. Mussaleen*, 35 F.3d 692, 696 (2d Cir. 1994) (quoting *United States v. Alvarado*, 882 F.2d 645, 650 n. 5 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990)).  *See also United States v. Price*, 516 F.3d 597, 604

(continued...)

"[T]he rule of completeness is violated 'only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant.'" *United States v. Yousef*, 327 F.3d 56, 154 (2d Cir. 2003) (quoting *United States v. Benitez*, 920 F.2d 1080, 1086-87 (2d Cir. 1990)).   "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Johnson*, 507 F.3d at 796 (quoting *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999), *vacated on other grounds*, 196 F.3d 383 (2d Cir. 1999), *cert. denied*, 530 U.S. 1267 (2000)).

A defendant's self-*in*culpatory statements, then, are admissible as non-hearsay admissions by a party-opponent; *see* Fed. R. Evid. 801(d)(2).  *See, e.g.*, *United States v. Hoffecker*, 530 F.3d 137, 192 (3d Cir. 2008) (district court's decision to allow government to introduce and play for jury portions of audiotape on which defendant made self-incriminating statements to undercover agents was not erroneous, because statements were offered as admissions by a party-opponent under Rule 801(d)(2)); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (self-inculpatory statements, when offered by government, are admissions by a party-opponent and are therefore not hearsay) (citing Fed. R. Evid. 801(d)(2)).

Self-serving, *ex*culpatory statements, on the other hand, are hearsay, and are therefore generally not admissible, unless their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence.  Where the danger of such distortion does not exist, however, a defendant may not rely on the rule of completeness to put his out-of-court exculpatory statements before the jury through the testimony of another witness (such as Cassidy), while at the

---

[4](...continued)
(7th Cir. 2008) ("Although Rule 106 applies only to written statements, we apply the same analysis to oral statements").

same time maintaining his own Fifth Amendment privilege so as to avoid being cross-examined about his prior statements. *See Ortega*, 203 F.3d at 682 (stating that defendant's "non-self-inculpatory statements are inadmissible hearsay," and that "[i]f the district court were to have ruled in his favor, Ortega would have been able to place his exculpatory statements 'before the jury without subjecting [himself] to cross-examination, precisely what the hearsay rule forbids'") (quoting *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir.), *cert. denied*, 488 U.S. 832 (1988)); *see also Williamson v. United States*, 512 U.S. 594, 599 (1994) ("[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts [which are hearsay]"); *United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) ("Rule 106 does not ... render admissible the evidence which is otherwise inadmissible under the hearsay rules, [n]or does it require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party'") (internal quotation marks and citations omitted); *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay), *cert. denied*, 128 S.Ct. 2902 (2008); *United States v. Rivera*, 61 F.3d 131, 136 (2d Cir. 1995) ("Rule 106 does not render admissible evidence that is otherwise inadmissible") (citing *United States v. Terry*, 702 F.2d 299, 314 (2d Cir.), *cert. denied*, 461 U.S. 931 (1983)); *United States v. Mahaffy*, No. 05-CR-613, 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) ("A court may ... exclude any portion that consists largely of a defendant's 'own self-serving statements, which, as offered by him, are inadmissible hearsay'") (quoting *Jackson*, 180 F.3d at 73).

- 11 -

In *Johnson*, for example, a Hobbs Act prosecution in which the defendant was charged with robbery and murder, the district court admitted the portions of the defendant's post-arrest statements in which he described the planning of the robbery, without including his statements about what happened during the robbery, in which he claimed that other individuals had committed the murder. Finding no abuse of discretion in that ruling, the Second Circuit agreed with the district court's conclusion that

> the redacted portion did not explain the admitted portion or place the admitted portion in context. The admitted portion of the confession related to [the] plans to execute the robbery, while the redacted portion related to the execution of the robbery. Moreover, the admitted portion pertained to conduct that occurred before [defendant] entered the apartment, while the redacted portion related to what happened inside the apartment. Accordingly, the redacted statements were "neither explanatory of nor relevant to the admitted passages," and the District Court therefore did not err in refusing to admit them.

*Id.* at 796-97 (quoting *Jackson*, 180 F.3d at 73).

Other courts have reached similar results. *See, e.g., Hoffecker*, 530 F.3d at 193 (defendant had "not shown that the ... tape [on which he made self-exculpatory statements] was necessary to explain or place in context [his incriminatory statements], avoid misleading the jury, or insure a fair and impartial understanding," and therefore district court did not err when it did not permit defendant to play tape in its entirety at trial); *Lentz*, 524 F.3d at 526 ("we are satisfied that the district court did not abuse its discretion in excluding the omitted portions [of defendant's recorded conversations] as they were neither necessary to avoid misleading the jury or to place the portions admitted into proper context"); *Ortega*, 203 F.3d at 681 (affirming exclusion of defendant's "own exculpatory statements, which were made within a broader, inculpatory narrative"); *United States v. Branch*, 91 F.3d 699, 728, 729 (5th Cir. 1996) (stating that defendant had "failed to show how any of the five, excluded portions of his post-arrest statement qualify, explain, or place into context other portions

- 12 -

about which [law enforcement officer] testified," and that "a defendant [must] demonstrate with particularity the unfairness in the selective admission of his post-arrest statement"), *cert. denied*, 520 U.S. 1185 (1997).

Here, I find that Harper's statements to Cassidy in which "[h]e denied that [the guns] were his," that "his brother ha[d] problems," and that "he knew the guns didn't belong to his parents or to him, so they must be his brother's" (Dkt. #141 at 3), are not necessary "to explain [his other statements in the interview], to place [those other statements] in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the" other statements. *Johnson*, 507 F.3d at 793. Those statements do not "explain" or provide context for Harper's other statements, but were merely self-serving assertions of innocence, and their exclusion will in no way distort the meaning of the statements that the government seeks to introduce.

I reach a different conclusion, however, as to Harper's response to Cassidy's query about why Harper had said that he thought be might be charged with possession of stolen property, *i.e.*, Harper's statements about the guns looking like hunting guns and his fear that the DA's office "would be out to get him ... ." In my view, those statements are necessary to explain, or to ensure a fair and impartial understanding of, defendant's prior statement to Cassidy (which the government does seek to introduce) that defendant "knew that he was looking at ... some kind of possession of stolen property" charge. It seems only fair, if the jury is going to hear the latter statement, that they also hear defendant's explanation–which was made in response to a question from the investigator–of *why* he believed that he was facing a stolen-property charge. Certainly the jury may not find Harper's explanation credible, but they should hear it, in order to have a full context within which to evaluate the rest of Harper's statements to Cassidy.

Accordingly, the Court denies, in part, the government's motion to preclude as to defendant's self-exculpatory statements during his interview with Cassidy.   If Cassidy testifies, in the government's case-in-chief, about Harper's statement that he was "looking at ... some kind of stolen property" charge, defendant may seek to elicit, on cross-examination, testimony concerning Harper's response to Cassidy's question about "why [Harper] said that he would be charged with stolen property."

**B. Statements to Gertrude Harper**

The government intends to offer recordings of a telephone conversation between defendant and his mother that took place on April 13, 2006, while defendant was incarcerated at the Monroe County Jail.[5]  As with Harper's statements to Cassidy, however, the government seeks to redact certain portions of the conversation.  A two-part transcript of that conversation has been submitted by the government as Exhibits A and B to its Motion in Limine #2 (Dkt. #141), which will be referred to herein as "T1" and "T2."

Substantial portions of the conversation that the government seeks to preclude, especially at the beginning of the conversation, appear to have little or no relevance to this case, and I see no basis for their admission.  Defendant does not appear to object to the government's motion to redact those parts of the conversation, which mostly involve purely familial matters that do not directly involve the facts of, or charges in, this case.

---

[5]The conversation took place over the course of two telephone calls.  Apparently the first call had a time limit, and the second call was initiated within minutes after the first call was automatically terminated.  The conversation in the second call essentially picked up where the first call had left off.

At one point in the conversation, however, defendant and Mrs. Harper began to discuss the subject of Mrs. Harper calling defendant's attorney.[6]  Mrs. Harper indicated that she had spoken to defendant's lawyer the day before.  T1 at 5.  Harper then said to her, "Right now, now you spoke to him and you told him about the, about the statement thing," to which Mrs. Harper responded, "Nope, no I didn't. ... Because I had talked to my lawyer first."  *Id.*

Defendant replied, "What is he sayin'?"  Mrs. Harper answered, "He said, 'You're gonna get time.'  He there's [sic], 'I can't promise you nothing.'  He said, 'If you do that,' he said, 'furthermore, they might not even believe you' because of this and that."  *Id.*

Defendant then responded, "I told you he was gonna be negative with the shit," and "you gotta know that that's just a scare tactic ... ."  *Id.*  Mrs. Harper protested that she "c[ould]n't take the chance like you said," but defendant interrupted her, "Didn't I tell you that was gonna happen and didn't I tell you that you were going to do that shit?"  Defendant repeated several times, "I told you," or words to that effect, suggesting that whatever they were discussing related to a matter that they had talked about on a prior occasion.

A little later in this conversation, defendant stated,

[S]o okay, I'm just telling it the way that it is now.  I'm calling all kinds of people on the stand, including Joe.  He's gotta go down for his shit too.  I'm not taking all of his guns and them guns that were down there in in [sic] your bedroom, Trudy.  It's not happening, since it's every man for themselves.  Fuck that shit.  Right?  'Cause Kenny's in it right?  Just like you said.  So, Dad's gotta do his time too.  Fuck that shit, let him get around that.  If he wants to get caught yeah with stolen fuckin' handguns from the South that were used in crimes, do you think I'm gonna take that?

Mrs. Harper replied, "No."  T1 at 8.

---

[6]Unless and until otherwise indicated, the government seeks to admit these portions of the conversation.

The statements that the government seeks to preclude come a little later in the conversation. Defendant continued to press Mrs. Harper to do whatever it was that she appeared to be reluctant to do, and at one point she said to him, "But Glenn, you shouldn't even ask me to do that."  Defendant responded, "But you shouldn't ask me to."  He then continued, "That's not my house, those ain't mine, what the fuck are you talking about?  That's not my house, that's not my shit."  T1 at 9.  Mrs. Harper replied, "Right."  *Id.*

The government seeks to preclude those last two sentences by defendant, as well as portions of the subsequent conversation between defendant and Mrs. Harper in which defendant repeated that "they're not [his]" and that he's "not taking responsibility for none of them ... ."  T1 at 10.  Later in the conversation, defendant asked, "Why destroy [my life]?  For something that wasn't in my house, that's that's [sic] my shit?"  T1 at 11.

Mrs. Harper continued, during this conversation, to express her reluctance to carry out defendant's wishes, apparently because she feared that she could be sent to prison if she did what he wanted her to do.  At one point, defendant, apparently attempting to reassure Mrs. Harper that she would not go to prison, stated, "[Y]ou won't and you know you won't, just like you knew Dad wasn't, when you sent him down to get on the stand for me.  He told a blatant lie, he got up there the second time and said what he said."  T2 at 2.

The government seeks to introduce those two sentences, on the ground that they show that defendant was trying to persuade Mrs. Harper to lie for him, and that his statements thus demonstrate his consciousness of guilt.  The government also moves, however, to preclude the introduction of defendant's statements, a few sentences later, "I know what you're doin' to me, and I'm not goin' down by myself for this sucka shit, because I didn't fuckin' do nothin'.  Still goin' to trial."  *Id.*

- 16 -

The government contends that throughout this conversation, defendant was attempting to persuade Mrs. Harper to state–falsely–that the firearms that were seized by the police on April 22, 2005 belonged to her (or at least that they did not belong to defendant).   According to the government's interpretation of the conversation, Harper was trying to convince his mother that because of her age and other circumstances, she would not be risking any jail time for herself if she made such a statement, either to defendant's attorney or to the authorities.

Based on that interpretation of defendant's statements, the government argues that the statements are admissible under Rule 802(d)(2)(A) as admissions by defendant.  The government also argues, however, that defendant's other statements to his mother to the effect that the guns did not belong to him, such as "those ain't mine" and "I didn't ... do nothin'," are inadmissible hearsay.

As with Harper's statements to Investigator Cassidy, I believe that at least some of the statements that the government seeks to preclude here should be admitted under the rule of completeness.  Harper's statements disavowing ownership of the guns that were seized provide context for, and tend to explain, his other statements in which he (arguably) urges his mother to provide a statement exculpating defendant from responsibility for the guns.

The government's interpretation of this conversation–that Harper wanted his mother to "take the rap" for him, essentially as a favor to him–may be a plausible one, but in the transcript Harper never states explicitly what it is that he is asking Mrs. Harper to do or why.  Rather, defendant brought up what he referred to as "the statement thing," but he never said exactly what he meant by that.  Mrs. Harper, who apparently had previously talked to defendant about this matter and understood what he was referring to, replied that she had spoken to her lawyer about it, and that her

lawyer had warned her that she was "gonna get time" if she went ahead with "the statement thing," and that "they might not even believe [her]."

It does seem reasonable to infer from this conversation that defendant wanted Mrs. Harper to make some sort of statement–to whom is not clear–and that Mrs. Harper was concerned that doing so might expose her to some criminal liability.  Presumably, this "statement" would have tended to exculpate defendant with respect to the seized firearms.

Peppered throughout this conversation, however, as defendant continues to implore his mother to help him, are statements by Harper indicating that one reason *why* she should help him is that at least some of the guns did not belong to defendant.  Defendant said to her, for example, "That's not my house, those ain't mine ... .  That's not my house, that's not my shit."  T1 at 9.  A little later, defendant stated, "[T]hey're not mine ... .  I'm not taking responsibility for none of them ... ."  T1 at 10.

Similarly, at one point, defendant stated, "[W]hy not just do the right thing, then?  You're not livin' life anyway.  Why destroy mine?  For something that wasn't in my house, that's that's [sic] my shit?  That's what I don't understand."[7]  T1 at 11.  Later, defendant stated, "I'm not goin' down by myself for this ... because I didn't fuckin' do nothin'."  T2 at 2.

Viewed in the context of the entire conversation between defendant and Mrs. Harper, these statements could certainly be interpreted as arguments that Mrs. Harper *ought* to help defendant by making some sort of exculpatory statement, in part at least because she knew that the guns did not belong to defendant.  As such, those statements provide context for, and help explain, the rest of defendant's statements urging Mrs. Harper to "do the right thing and ... help [him] get outta here ...

---

[7]The government seeks to redact only the fourth of those five sentences.

." T2 at 2.  Conversely, if the Court were to grant the government's motion to redact the statements in question, the meaning and import of the remaining portion of defendant's conversation could be distorted, as the jury could be left with the impression that defendant based his request to his mother entirely on an appeal to her sense of pity, maternal feelings, or similar emotions having nothing to do with his actual guilt or innocence.[8]

Even with these self-exculpatory statements included, of course, the jury could still accept the government's interpretation of this conversation.  Defendant's statement about how Mrs. Harper "knew Dad wasn't[ going to be sent to prison], when [she] sent him down to get on the stand for [defendant]" and how "[Dad] told a blatant lie" on the witness stand could certainly be interpreted as suggesting that Mrs. Harper should lie for defendant in similar fashion.

At other points in this conversation, defendant also appears to play on Mrs. Harper's feelings of guilt and sympathy; he stated, for example, that  Mrs. Harper "want[ed him] to go out and die and just go to prison," T1 at 7, that he was getting "no help from [her], ... like it's never been," and that she "d[id]n't give a damn" about what happened to him.  T1 at 8.  Elsewhere he warned her, "You just want me to go away ..., but you haven't heard the last of me, though," but he then cajoled her with a promise that if she helped him get out of jail, "you'll never fuckin' see me again, I swear to Jesus, Trudy, you'll never see me again."  T2 at 2.

---

[8]There is one part of the telephone conversation that the government does not seek to redact in which defendant made certain statements that could be interpreted as implying that some of the guns belonged to other members of the family; *see* T1 at 8 (defendant's statements that "Joe" has "gotta go down for his shit too.  I'm not taking all of his guns," and that "Dad's gotta do his time too").  Defendant's other statements that the government does seek to redact, however, more clearly disavow defendant's ownership of the guns, and I believe that their inclusion is necessary to allow the jury to engage in a fair and impartial reading of the overall conversation between defendant and his mother.

In short, defendant appears to have tried everything he could think of to convince his mother to testify, or make some sort of statement, in a way that would exculpate him from responsibility for the seized guns.  He alternately wheedled and browbeat her with appeals to her feelings of guilt, familial loyalty, and pity, as well as to her sense of justice and of right and wrong.[9]  That will assuredly come through even with the self-inculpatory statements included, and there will be ample fodder for both sides to argue to the jury their respective interpretations of this conversation.

In reaching this conclusion, I am mindful of the Second Circuit's statement that under the rule of completeness, an "omitted portion of [a] statement *must* be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."  *Johnson*, 507 F.3d at 793 (emphasis added).  Although "[t]he trial court's application of the rule of completeness is reviewed for abuse of discretion," *id.*, the Court of Appeals' use of the word "must" suggests that, if the district court finds, in the exercise of its discretion, that the rule of completeness does apply–*i.e.*, that a particular statement is necessary to explain another statement or statements that are in evidence–then admission of the former statement is mandatory.[10]  *See also Branch*, 91 F.3d at 750

---

[9]In other portions of the conversation that the government seeks to redact, and which the Court will order redacted, defendant also berated Mrs. Harper for "flushing [her] kids down the toilet," T1 at 10, and for "keepin' a ugly heart" and caring more about her dogs than about her family.  T2 at 3.

[10]I also note that, although the statements at issue here are self-exculpatory hearsay, and are "self-serving" in the sense that they were intended to serve defendant's purpose of persuading his mother to make a statement of some kind, they are distinguishable from the self-exculpatory statements that Harper made to Investigator Cassidy about the guns belonging to Harper's brother.  At the time that he spoke to Cassidy, defendant could have assumed that Cassidy had no independent knowledge of who owned the guns, which might have given defendant a motive to lie to Cassidy about that matter.  Defendant's statements to his mother, however, can be read as

(continued...)

("Under the rule of completeness embodied in Fed. R. Evid. 106, additional portions of a defendant's statement must be admitted if they are relevant to the issues in the case and qualify or explain the subject matter of the portion offered by the opponent") (internal quotation marks and brackets omitted).

Accordingly, I deny, in part, the government's motion to redact portions of the recorded conversation between defendant and his mother on April 13, 2006, as set forth more fully in the Conclusion of this Decision and Order.


### III. Rule 608(b) Motion

In its third motion in limine (Dkt. #155), the government moves to preclude defendant from introducing any evidence, eliciting any testimony, or questioning defendant's brother Kenneth Harper ("Kenneth") or any other witness, about certain conduct committed, or alleged to have been committed, by Kenneth.

The government states that it may decide to call Kenneth–who was arrested at the same time and location as defendant–as a witness in this case.   Pursuant to a plea agreement with the government, Kenneth has pleaded guilty to a violation of 18 U.S.C. § 922(g)(1), *i.e.*, being a felon in possession of a firearm.

Kenneth has two prior felony convictions, one in 1999 for criminal possession of stolen property in the third degree, and another in 2000 for criminal possession of a controlled substance

---

[10](...continued)
indicating that he believed that she did know who owned (or had stolen) the guns, which had been seized from her home.  If that were the case, then presumably it would have made no sense for defendant to lie to her about that.

in the fifth degree.  In addition, there are several other matters in which Kenneth has been implicated in criminal activity, including alleged involvement in street-level drug sales, an alleged assault on a woman in March 2008, and failures to comply with the conditions of his supervised release in this case.  In addition, on April 29, 2008, Kenneth sustained a single gunshot wound to his shoulder and jaw, although there does not appear to be any evidence that this was the result of any criminal activity by Kenneth.

In general, "evidence that a witness other than an accused has been convicted of a [felony] shall be admitted, subject to [balancing under] Rule 403 ... ."  Rule 403 provides, in turn, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Applying that rule here, I find that Kenneth's two felony convictions are admissible under Rules 609 and 403.  The government recognizes that, subject to Rule 403 balancing, defendant is entitled to impeach Kenneth by questioning him about his prior felony convictions, *see* Government's Motion in Limine #3 (Dkt. #155) at 12, and I do not believe that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice.

With respect to the other instances of Kenneth's alleged misconduct, Rule 608(b) provides that

> [s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.  They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

In the case at bar, defendant does not appear to assert, nor do I find, that the alleged acts of prior misconduct by Kenneth are probative of Kenneth's truthfulness or untruthfulness.  None of these alleged acts involves fraud, deceit, or dishonesty.  *See United States v. Marino*, 277 F.3d 11, 24 (1st Cir. 2002) (excluding testimony contradicting witness's characterization of his activities as a drug dealer as extrinsic evidence on a collateral matter in violation of Rule 608(b)); *United States v. Miles*, 207 F.3d 988, 993 (7th Cir. 2000) ("crimes such as 'murder, assault, [and] battery' may be probative of violence, but they do not normally bear on a witness's reliability for telling the truth") (quoting *Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1567 (7th Cir. 1990) (en banc)); *United States v. Turner*, 104 F.3d 217, 223 (8th Cir. 1997) ("Misconduct involving violations of narcotics laws is not an act involving dishonesty or untruthfulness and therefore may not be inquired into under Federal Rule of Evidence 608(b)").

Defendant contends, however, that this evidence is relevant to show bias on Kenneth's part. Defendant also contends that this evidence is admissible insofar as it supports defendant's theory that Kenneth is responsible for some or all of the weapons seized from 151 Third Street.

"When offered [to show bias], misconduct is not limited by the strictures of Rule 608(b)." *United States v. Schwab*, 886 F.2d 509, 511 (2d Cir. 1989), *cert. denied*, 493 U.S. 1080 (1990). Extrinsic evidence of misconduct is therefore admissible when it is offered to show bias.  *See United States v. Gomes*, 177 F.3d 76, 81 (1st Cir.) ("extrinsic evidence is admissible to show bias"), *cert. denied*, 528 U.S. 911 (1999).

At the same time, however,  a "trial court has wide discretion to impose limitations on the cross-examination of witnesses," even where the evidence relates to a witness's bias. *United States v. Flaharty*, 295 F.3d 182, 190 (2d Cir. 2002); *see*, *e.g.*, *Gomes*, 177 F.3d at 81 (stating that

defendants' "bias theory probably holds together, but the trial judge had discretion to exclude such an excursion into extrinsic evidence that would distract from the main issues and in this case would add little of practical value to the defense," since the witness's "cooperation agreement already gave the jury an ample ... reason to question [his] testimony as the fruit of lenient treatment").

In the case at bar, defendant has not clearly articulated how the evidence of Kenneth's prior misconduct would demonstrate "bias," which the Supreme Court has defined as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel*, 469 U.S. 45, 52 (1984). What defendant appears to be saying is that he wants to show that Kenneth has frequently been in trouble with the law, and that this makes it more likely that Kenneth will "do anything now to save his own neck ... ." Defendant's Response to Government's Motion in Limine #3 (Dkt. #160) ¶ 8. The apparent implication is that Kenneth–whose plea agreement contains a cooperation provision, *see* Dkt. #57 ¶¶ 19-30–has a motive to testify falsely against his brother Glen in order to help the government obtain a conviction of Glen, in the expectation that Kenneth will then receive more favorable treatment from the government, and, ultimately, from the Court at the time of sentencing.

It is true that "[b]ias may be induced by a ... witness' self-interest," and that "[p]roof of bias is almost always relevant ... ." *Abel*, 469 U.S. at 52. *See also United States v. Manske*, 186 F.3d 770, 777 (7th Cir. 1999) (bias "is the 'quintessentially appropriate topic for cross-examination'") (quoting *Bachenski v. Malnati*, 11 F.3d 1371, 1375 (7th Cir. 1993)). Nevertheless, the mere invocation of the word "bias" does not automatically justify the wholesale introduction of evidence about a witness's prior misconduct, regardless of its nature, remoteness in time, or whether it actually occurred. *See United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir. 1984) ("trial courts can require the

defendant to offer a threshold level of evidence to show that the defendant's allegations of witness misconduct have some grounding in reality"). There must be some demonstration of relevance, and the Court must still engage in the Rule 403 balancing test before the evidence may be admitted.

Here, it is far from clear that, by testifying against defendant, Kenneth actually has anything to gain with respect to these various incidents of alleged past misconduct on his part, some of which occurred many years ago, and for which he was never charged. Kenneth's cooperation agreement does provide, in part, that in exchange for his guilty plea and cooperation, Kenneth will not be prosecuted in this district for any other non-violent firearm or drug offenses committed up to the date of the agreement (February 27, 2006) and about which he provides complete and truthful information. Dkt. #57 ¶ 21.[11] Some of the incidents at issue here, though, post-date the agreement, and at least one–an alleged assault on a woman in March 2008–involves an apparent crime of violence.

Furthermore, it is worth noting that, on its face, the agreement calls for Kenneth not simply to give testimony that is *helpful* to the prosecution (in the sense that it tends to incriminate Glen Harper), but to give testimony that is *truthful*. The government's promises to Kenneth are expressly conditioned on his testifying truthfully, and on his providing truthful information to the government. Dkt. #57 ¶¶ 19-25. The agreement also explicitly provides that Kenneth will not be protected from prosecution for perjury, should he be found to have testified falsely. Dkt. #57 ¶¶ 22, 24. That would seemingly neutralize any incentive that Kenneth might otherwise have to lie about defendant's criminal activities.

---

[11]The government has also promised, conditioned upon Kenneth's cooperation, to move at the time of sentencing for a downward departure pursuant to § 5K1.1 of the Sentencing Guidelines. Dkt. #57 ¶ 23.

Even assuming *arguendo* that Kenneth might stand to gain (or that he might believe that he stands to gain) by lying, the Court cannot determine, at this juncture, whether and to what extent defendant should be permitted to cross-examine Kenneth at trial about the incidents in question. The details of these incidents have been only sparsely outlined at this point, and some of them–particularly Kenneth's sustaining a gunshot wound in April 2008, under circumstances that are unclear–may not even involve any wrongdoing on Kenneth's part. Without additional facts, both as to the circumstances surrounding these incidents themselves, and to show that Kenneth, by testifying against defendant, could potentially avoid prosecution, or benefit in some other way with respect to these incidents, I am unable to determine the extent to which inquiry into these matters would be appropriate to show bias or self-interest on Kenneth's part.

Except for Kenneth's felony convictions, which have been addressed above, and with one other exception that is discussed below,  I therefore reserve decision on the government's motion in limine to preclude or limit inquiry concerning Kenneth Harper's past misconduct, pending further exploration of these matters either closer to or during the trial.

Aside from Kenneth's felony convictions, which, as stated, may be inquired into on cross-examination under Rule 609, there is one matter about which I believe defense counsel should be permitted to cross-examine Kenneth, and that is his statement concerning his prior ownership of a handgun. According to the government, Kenneth underwent a polygraph examination in connection with his proffer agreement in this case. During that examination (which, according to the government, "revealed no deception," Dkt. #155 at 4), Kenneth stated that he had previously owned

a handgun, which he no longer owned, and which was not among the firearms seized in this case. Dkt. #155 at 4.[12]

That statement appears to be relevant to defendant's theory that at least some of the firearms at issue in this case belonged to Kenneth.  As such, its admission is governed by Rule 404(b).  *See Schwab*, 886 F.2d at 511 (prior misconduct "may be relevant to an issue in the case, such as intent or identity.  When offered for that purpose, prior misconduct is governed by Fed. R. Evid. 404(b)" rather than by Rule 608(b)).

Evidence that Kenneth previously owned a handgun is relevant to show his knowledge and intent with respect to the firearms at issue in this case, and relates directly to Glen Harper's defense that Kenneth, not he, owned or possessed those firearms.  *See*, *e.g.*, *United States v. Rodriguez*, 53 F.3d 545, 546 (2d Cir.) (finding no error in district court's admission in firearm case of evidence of other guns found in apartment co-owned by defendant and his wife) (per curiam), *cert. denied*, 516 U.S. 893 (1995); *United States v. Cassell*, 292 F.3d 788, 790-96 (D.C. Cir. 2002) ("evidence of Cassell's prior gun possessions was relevant to show his knowledge of and intent to possess the firearms recovered from his bedroom," which formed the basis for firearms charges against him); *see also United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001) ("in cases where a defendant is charged with unlawful possession of something, evidence that he possessed the same or similar things at other times is often quite relevant to his knowledge and intent with regard to the crime charged") (citing *Huddleston v. United States*, 485 U.S. 681, 689 (1988)).  Because "[t]he defendant should be given wide latitude in cross-examining a government witness in a criminal case," *United*

---

[12] It is not apparent from the record whether Kenneth's ownership of the handgun was lawful.  "Prior acts need not be unlawful to be admissible under Rule 404(b)," however.  *United States v. Iverson*, 162 F.3d 1015, 1027 (9th Cir. 1998) (internal quote omitted).

*States v. Weiss*, 930 F.2d 185, 197 (2d Cir. 1991), *accord Manske*, 186 F.3d at 777, and because it appears that the probative value of this evidence will not be outweighed by the danger of unfair prejudice, the Court denies the government's motion in limine seeking to preclude defendant from questioning Kenneth Harper about this matter.

## CONCLUSION

The government's Motion in Limine #1 (Dkt. #140) is granted.  The government may introduce at trial the certified CAD printout (Dkt. #140 Ex. A) of the City of Rochester Emergency Communications Department relating to defendant's arrest on September 20, 2004.

The government's Motion in Limine #2 (Dkt. #141) is granted in part and denied in part. With respect to defendant's statements to Rochester Police Department Investigator Thomas Cassidy on April 22, 2005, if Investigator Cassidy testifies about Harper's statement that he was "looking at ... some kind of stolen property" charge, defendant may seek to elicit, on cross-examination, testimony concerning Harper's response to Cassidy's question about "why [Harper] said that he would be charged with stolen property."

With respect to defendant's statements to his mother during their recorded telephone conversation on April 13, 2006, the government's motion to redact portions of that conversation is granted in part and denied in part.  Attached as Exhibits A and  B to this Decision and Order is a copy of the transcript of that conversation.  The portions as to which the government's motion is

granted, which will be redacted, are in "strikeout." The portions as to which the government's motion is denied, which will not be redacted, are highlighted in "redline" and in boldface.[13]

The government's Motion in Limine #3 (Dkt. #155) is denied insofar as it seeks to preclude inquiry into Kenneth Harper's 1999 and 2000 felony convictions for criminal possession of stolen property in the third degree and for criminal possession of a controlled substance in the fifth degree, respectively. The motion is also denied insofar as it seeks to preclude inquiry into Kenneth Harper's admission to government agents during a polygraph examination that he previously possessed a .40 caliber handgun. The Court reserves decision on the motion in all other respects.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       January 20, 2009.

---

[13]The remaining portions, which are in ordinary font, are those that the government seeks to admit, and which will be admitted.